# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JAMES T. KOWATCH, JAMES N. KOWATCH, DONALD SCHEELER, BRP2 LLC, and NPVI, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ACI LEARNING HOLDINGS, LLC, INFOSEC LEARNING, INC. (f/k/a) ISL INTERMEDIATE, LLC, BOATHOUSE CAPITAL LP, BOATHOUSE CAPITAL CONTINUATION FUND LP, and CHONG MOUA, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 2025-1398-SKR <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Submitted: May 22, 2026
Decided: August 13, 2026

## MEMORANDUM OPINION AND ORDER

*Upon Consideration of*
*Defendants' Motion to Dismiss the Complaint:*
**GRANTED-IN-PART AND DENIED-IN-PART**

Allison M. Neff, Esquire, SAUL EWING LLP, Wilmington, DE, Stephen Ma, Esquire, SAUL EWING LLP, Los Angeles, CA. *Attorneys for Plaintiffs.*

Aaron E. Moore, Esquire, MARSHALL DENNEHEY, P.C., Wilmington, DE, Josh J.T. Byrne, Esquire, MARSHALL DENNEHEY, P.C., Philadelphia, PA, *Attorneys for Defendants.*

**Rennie, J.[1]**

---

[1] Sitting as a Vice Chancellor of the Court of Chancery by designation.

## I.   INTRODUCTION

In December 2023, Plaintiffs sold their cybersecurity company to Defendants in exchange for cash, two earnouts, and equity in the acquiring company. Because the value of the earnouts and the equity depended on the acquiring company's success, Plaintiffs conducted due diligence. During this process, Defendants provided a spreadsheet that allegedly misrepresented the company's earnings. Further, they failed to disclose that, just weeks before closing, they were notified that a government program accounting for 40% of the company's revenue was "exhausted" and that the company could no longer onboard new participants.

Separately, after closing, Defendants executed a series of transactions allowing purported insiders to purchase new shares in the acquiring company on overly favorable terms, which diluted Plaintiffs' equity.

Plaintiffs sued for fraud and breach of fiduciary duty, and Defendants now move to dismiss. The results are mixed. Defendants correctly argue that the misrepresentations were extracontractual; however, only two of the parties' three agreements contain anti-reliance language. Because the Share Purchase Agreement lacks such language, the fraud claims may proceed on that basis. Therefore, as to the fraud-related claims, the Motion is GRANTED in part and DENIED in part. Because Plaintiffs fail to sufficiently allege either a direct or derivative claim, the Motion is GRANTED as to the breach of fiduciary duty claims.

## II. BACKGROUND[2]

### A. The Parties

This case arises out of the December 6, 2023, acquisition of Infosec Learning, Inc. ("Infosec"), a Colorado-based cybersecurity company,[3] by Defendant ACI Learning Holdings, LLC ("ACI").[4] Prior to the acquisition, Infosec was owned by Plaintiffs James T. Kowatch; James N. Kowatch; Donald Scheeler; BRP2 LLC; and NPVI, LLC (collectively, "Plaintiffs").[5]

ACI, the acquirer, is a portfolio company.[6] At the time of the acquisition its managing member was Defendant Boathouse Capital LP ("Boathouse Capital").[7] Shortly after the transaction, Boathouse Capital was replaced as managing member by Defendant Boathouse Capital Continuation Fund LP ("Boathouse CCF" and, together with Boathouse Capital, "Boathouse").[8] Defendant Chong Moua ("Moua") serves as the chair of ACI's board and is managing partner of both Boathouse entities.[9]

---

[2] The facts are drawn from the well-pled allegations in the Verified Complaint (the "Complaint") (Docket Item ("D.I.") 1) [hereinafter "Compl."], as well as the parties' Stock Purchase Agreement (the "SPA") (D.I. 15 Ex. B) [hereinafter "SPA § __"] incorporated therein.

[3] Compl. at ¶¶ 11, 18.

[4] *Id.* at ¶ 1.

[5] *Id.* at ¶¶ 5–9.

[6] *Id.* at ¶ 19.

[7] *Id.* at ¶ 12.

[8] *Id.* at ¶ 13.

[9] *Id.* at ¶ 14.

## B. The Acquisition

On December 6, 2023, (the "Closing") the parties executed a Stock Purchase Agreement (the "SPA").[10] In exchange for their equity in Infosec, Plaintiffs received $9,500,000 in cash at closing and the opportunity to earn up to $6,500,000 across two earnouts (the "2023 Earnout" and "2024 Earnout").[11] Concurrently with the execution of the SPA, Plaintiffs James T. Kowatch and BRP2 LLC (the "Rollover Plaintiffs") rolled over a portion of their proceeds into ACI equity valued at $4,000,000 (the "Rollover Equity"), pursuant to two separate rollover agreements (the "Kowatch Rollover Agreement" and the "BRP2 Rollover Agreement," together the "Rollover Agreements").[12]

Two provisions of the SPA are relevant to the pending motion. Section 5.6 of the SPA ("Section 5.6") contains a general release and waiver that Defendants contend bars Plaintiffs from asserting fraud claims arising out of the negotiation, execution, or performance of the SPA.[13] Section 5.6 also contains a representation by Plaintiffs that they possessed adequate information to make an informed investment decision, investigated all facts and claims to their satisfaction, and

---

[10] *Id.* at ¶ 2.

[11] *Id.* at ¶ 20.

[12] *Id.* at ¶¶ 2, 27–28 (providing details).

[13] SPA § 5.6.

3

assumed the risk of "unknown or anticipated" claims that, if known at Closing, may have materially affected their decision to enter the SPA.[14]

Additionally, Section 4.7 of the SPA states that the buyers make no express or implied representations or warranties, including as to the "accuracy or completeness" of any information furnished regarding ACI or as to ACI's "future revenue, profitability, or success[.]"[15] Finally, the Rollover Agreements contain express anti-reliance language, providing that each Rollover seller "relied solely upon its own investigation and the express representations and warranties" set forth therein.[16]

## C. The Due Diligence Deceptions

The transaction began in earnest three months prior to Closing, when the parties executed a Letter of Intent and commenced due diligence.[17] Plaintiffs allege that, during the due diligence period, Defendants committed two forms of fraud through both affirmative misrepresentations and material omissions.

First, on October 9, 2023, Moua circulated a financial workbook detailing ACI's historical performance over the preceding five years, including its earnings before interest, taxes, depreciation, and amortization ("EBITDA") (the "Investment

---

[14] SPA §§ 5.6(d), (e).

[15] *Id.* at § 4.7.

[16] *See* Section 4(m) of each Rollover Agreement.

[17] Compl. ¶¶ 20–22.

4

Workbook").[18] The Investment Workbook represented that ACI's 2022 EBITDA was $14.1 million.[19] However, on December 11, 2023, five days *after* Closing, ACI issued its October 2023 Financial Statements (the "Financial Statements").[20] These financial statements revealed that the Investment Workbook had significantly overstated ACI's historical earnings. Specifically, while the Investment Workbook reflected a 2022 EBITDA of $14.1 million, the Financial Statements revealed the actual figure was $6.9 million.[21] Similarly, ACI's trailing twelve-month adjusted EBITDA as of May 2023 was adjusted downward from the $13.9 million represented in the Investment Workbook to $8.3 million.[22] Plaintiffs allege that in July 2025, Moua explained that certain ACI executives had improperly recorded prospective business as earned revenue in the Investment Workbook, an error that was allegedly discovered and corrected by the time the Financial Statements were issued.[23]

Second, Plaintiffs alleged fraud by omission regarding a federal program known as "VET TEC," which historically accounted for approximately 40% of

---

[18] *Id.* at ¶¶ 25, 41.

[19] *Id.* at ¶ 42.

[20] *Id*. At oral argument, Defendants' counsel incorrectly stated that Plaintiffs received the Financial Statements *before* Closing. Oral Argument Transcript (D.I. 30) at 6:14 and 10:13–18.

[21] *Id.*

[22] *Id.* at ¶ 43.

[23] *Id.* at ¶ 58.

ACI's revenue.[24] In August 2023, prior to executing the Letter of Intent, Defendants learned that the VET TEC program would be discontinued in April 2024.[25] Thereafter, in November 2023, immediately preceding the Closing, the federal government notified Defendants that VET TEC's funding was exhausted, and directed ACI to cease onboarding new contracts under the program.[26] Defendants did not disclose these developments.[27] Consequently, Plaintiffs remained unaware of VET TEC's termination until after Closing.[28]

## D. The Rollover Equity Dispute

In addition to their pre-Closing fraud claims, Plaintiffs allege that Defendants intentionally diluted the Rollover Equity through a series of post-Closing corporate restructurings. In early 2024, Defendants executed an internal "continuation vehicle" transaction that transferred control of ACI from Boathouse Capital to Boathouse CCF and authorized the issuance of new ACI equity units (the "ACI CV Transaction").[29] In April 2024, Defendants provided the Rollover Plaintiffs with a revised capitalization table and an amended ACI operating agreement.[30] These

---

[24] *Id.* at ¶ 52.

[25] *Id.*

[26] *Id.*

[27] *Id.* at ¶ 53.

[28] *Id.* at ¶ 52.

[29] *Id.* at ¶ 29.

[30] *Id.* at ¶ 32.

documents disclosed that: (i) preferred units senior to the common stock (such as the Rollover Equity) had been created and were entitled to priority distributions, (ii) an "equity incentive plan" had been moved into ACI, and (iii) the Rollover Plaintiffs' stake in ACI had fallen from 3.49% to 2.82%.[31]

In November 2024, the Rollover Plaintiffs received a further amended operating agreement, establishing Class A and Class B preferred stock.[32] These senior units carried liquidation preferences of approximately $65,000 and $36,000 per-share, respectively, which required complete satisfaction before any distributions could be made to common stockholders.[33]

Finally, in July 2025, ACI issued unsecured convertible promissory notes to Boathouse affiliates ("Convertible Notes").[34] These notes convert into Class A preferred units, an event Plaintiffs allege will be highly dilutive to ACI's minority members.[35]

In sum, Plaintiffs allege that Defendants utilized these preferred equity structures to issue senior securities to Boathouse and its affiliates on preferential

---

[31] *Id.* at ¶ 33.

[32] *Id.* at ¶ 36.

[33] *Id.*

[34] *Id.* at ¶ 37.

[35] *Id.*

terms, systematically diluting the Rollover Plaintiffs' economic interests and subordinating their distribution priority.[36]

## E. Procedural History

Plaintiffs filed their Verified Complaint on December 2, 2025,[37] asserting five causes of action: ("Count I") common law fraudulent inducement against all Defendants for misrepresentations and omissions made during due diligence;[38] ("Count II") negligent misrepresentation against Boathouse and Moua for the same due diligence conduct;[39] ("Count III") breach of fiduciary duty against Boathouse and Moua for diluting the Rollover Plaintiffs' ACI shares through the ACI CV Transaction and subsequent transactions;[40] ("Count IV") aiding and abetting breaches of fiduciary duty against ACI and Infosec;[41] and ("Count V") civil conspiracy to commit both fraud and breach of fiduciary duty against all defendants.[42]

On January 28, 2026, Defendants filed their Motion to Dismiss the Complaint (the "Motion").[43] Plaintiffs filed their response on February 27, 2026 (the

---

[36] *Id.* at ¶ 39.

[37] *Id.* at ¶ 1.

[38] *Id.* at ¶¶ 60–69.

[39] *Id.* at ¶¶ 70–79.

[40] *Id.* at ¶¶ 80–86.

[41] *Id.* at ¶¶ 87–92.

[42] *Id.* at ¶¶ 93–96.

[43] *See* Motion (D.I. 15) [hereinafter "Mot."].

"Answering Brief"),[44] and Defendants filed their reply on March 13, 2026 (the "Reply Brief").[45] The Court heard oral argument on May 22, 2026.[46]

## III.    LEGAL STANDARD

When considering a motion to dismiss for failure to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6), this Court applies a plaintiff-friendly pleading standard.[47] The Court accepts as true all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff.[48] Dismissal is warranted only if the plaintiff would not be entitled to recover "under any reasonably conceivable set of circumstances."[49]

## IV.    ANALYSIS

The Court proceeds in four parts. First, the Court addresses whether Plaintiffs adequately stated a claim for fraudulent inducement based on the affirmative financial misrepresentations in the Investment Workbook. Second, the Court conducts a parallel fraudulent inducement analysis regarding Defendants' failure to disclose the operational status of the VET TEC program. Third, the Court addresses whether the Complaint adequately alleges a civil conspiracy to commit these

---

[44] *See* Answering Brief (D.I. 23) [hereinafter "Ans. Br."].

[45] *See* Reply Brief (D.I. 25) [hereinafter "Reply Br."].

[46] As previously noted, the Court references the oral argument by its transcript (D.I. 30) [hereinafter "Tr. --:--"].

[47] *Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *7 (Del. Ch. Jan. 26, 2024).

[48] *Cent. Mort. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[49] *Id.*

wrongs. Fourth, the Court addresses the Rollover Plaintiffs' claims for breach of fiduciary duty arising from post-closing equity dilution.

**A. Plaintiffs Allege Fraudulent Inducement by the Investment Workbook**

Plaintiffs allege that Defendants fraudulently induced them to execute the SPA and the Rollover Agreements by supplying an Investment Workbook that contained "material misrepresentations regarding ACI's historical revenue and adjusted EBITDA."[50] Defendants move to dismiss this claim, arguing that the Investment Workbook constitutes an extra-contractual representation disclaimed by the transaction documents, and that the allegations fail to satisfy the heightened pleading standards of Court of Chancery Rule 9(b).[51]

To state a claim for common law fraud under Delaware law, a plaintiff must allege facts plausibly demonstrating five elements:

> (1) a false representation, usually one of fact, made by defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[52]

Court of Chancery Rule 9(b) imposes a heightened standard for pleading certain aspects of a fraud claim.[53] It requires that "[i]n all averments of fraud ..., the

---

[50] Compl. ¶ 61.

[51] Mot. pp. 21–22.

[52] *In re P3 Health Gp. Hldgs., LLC*, 2022 WL 15035833, at *3 (Del. Ch. Oct. 26, 2022).

[53] *Labyrinth*, 2024 WL 295996, at *8 (reciting standard).

circumstances constituting fraud ... shall be stated with particularity. [But,] [m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally."[54]

### 1. Plaintiffs Allege the First Three Elements of Fraud

To identify a false representation with the requisite particularity, a plaintiff must allege "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[55]

The allegations concerning the Investment Workbook satisfy Rule 9(b)'s particularity standard. Plaintiffs allege that on October 9, 2023, Moua emailed the Investment Workbook to Plaintiffs' financial advisor to provide historical financial information data for ACI.[56] It specifically represented that ACI's 2022 EBITDA was $14.1 million and its trailing twelve-month adjusted EBITDA as of May 2023 was $13.9 million.[57]

Plaintiffs have adequately alleged the falsity of these figures by referencing the corrected financial information issued by ACI just five days after Closing.[58]

---

[54] *Id.* (quoting Ct. Ch. R. 9(b)).

[55] *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *12 (Del. Ch. Feb. 28, 2020) (quoting in full *Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

[56] Compl. ¶ 25.

[57] *Id.* at ¶ 41.

[58] Defendants have consistently maintained that Closing occurred not on December 6, 2023, but on December 26, 2023. Accordingly, they argue, Plaintiffs received the corrected financials well

11

ACI's own October 2023 Financial Statements revealed the Company's actual 2022 EBITDA was 6.9 million,[59] and its May 2023 adjusted EBITDA was $8.3 million.[60] The significant magnitude of these discrepancies, paired with the timing of the corrected disclosures, supports a reasonable inference that Defendants knew the Investment Workbook was false when disseminated, or recklessly failed to correct it prior to Closing.[61] Plaintiffs have further alleged general intent by asserting that Defendants utilized these overstated metrics to induce Plaintiffs to accept a non-cash consideration consisting of unachievable earnout terms and $4 million in Rollover Equity.[62]

## 2. *The SPA Lacks Clear Anti-Reliance Language, but the Rollover Agreements Bar Reliance*

Defendants contend that even if the Complaint satisfies Rule 9(b), the fraud claims fail as a matter of law because the Investment Workbook is an extra-contractual document, and reliance thereon is contractually barred.[63]

---

*before* Closing, thus undermining their reliance argument. *See* Tr. 10:15–17. However, the paragraph Defendants cite in support of this contention—Complaint Paragraph 26—represents that Closing was December 6, not December 26. Even setting aside the deference afforded the allegations at this juncture, the SPA *itself* is dated December 6, 2023. Mot. Ex. B. p. 1.

[59] Compl. ¶ 42.

[60] *Id.* at ¶ 43.

[61] *Id.* at ¶ 66.

[62] *Id.* at ¶ 68. Defendants do not dispute scienter for purposes of their Motion. Mot. p. 29.

[63] Mot. p. 22.

As an initial matter, Plaintiffs did not dispute in their briefs that the Investment Workbook is extra-contractual.[64] At oral argument, however, Plaintiffs asserted for the first time that the Investment Workbook was rendered *intra*-contractual by virtue of the SPA's earnout provisions.[65] This argument was waived. Under long-standing Delaware law, a party cannot raise an argument at oral argument that it failed to raise in briefing.[66] The Court, therefore, limits its review to the issue presented on the papers: whether the text of the transaction agreement contains an enforceable disclaimer of reliance.[67]

---

[64] Ans. Br. p. 10.

[65] Tr. 33:14.

[66] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (holding that issues not briefed are deemed waived). In *Origis USA LLC v. Great American Insurance Co.*, the Delaware Supreme Court held that if a trial court discusses the merits of an otherwise-waived argument, such analysis "may be sufficient to fairly present [the issue] to the trial court and enable this Court's review on appeal." 345 A.3d 936, 954 n.78 (Del. 2025) (quoting in full *Mundy v. Holden*, 204 A.3d 83, 87 (Del. 1964)); *see also In re Tesla, Inc. Deriv. Litig.*, 351 A.3d 1005 (TABLE), 2025 WL 3689114, at *10 n.92 (Del. Dec. 19, 2025). Accordingly, the Court must decide whether it can—without the benefit of opposing briefing—resolve the issue. Such a determination could align with the Delaware courts' long-standing preference for resolving issues on the merits. *See, e.g., Keener v. Isken*, 58 A.3d 407, 409 (Del. 2013) (holding that a particular rule is "liberally construed because of the policy favoring trials on the merits."). However, the injudicious application of this discretion could inadvertently incentivize parties to take the strategic risk of withholding positions on issues—like contract interpretation—with which the Court is intimately familiar and regularly resolves as a matter of law. The Court therefore declines to address the substance of Plaintiffs' new argument. Even if the argument before the Court may be sufficient to resolve the issue, the circumstances under which an issue could be "fairly presented" even when one party is deprived of its opportunity to engage are vanishingly rare.

[67] *See Johnson & Johnson v. Fortis Advs. LLC*, 352 A.3d 229, 274 (Del. 2026) (noting that the foundational case on reliance—*Abry Partners*—offers distinct frameworks for intra- and extra-contractual fraud).

Because Delaware maintains a strong public policy against fraud, a party seeking to disclaim reliance on extra-contractual statements must do so in clear, precise, and unmistakable terms.[68] Indeed, the "core requirement" under *Abry Partners* (and its progeny) for a party to waive its extra-contractual fraud claims is that the agreement must contain an affirmative statement by that party disclaiming reliance on any representations outside the four corners of the governing contract.[69]

Defendants concede that the SPA does not "specifically disclaim reliance."[70] Rather, they argue that Sections 4.7 and 5.6 operate together to disclaim reliance, pointing to language they contend is analogous to provisions enforced in *RAA Management, LLC v. Savage Sports Holdings, Inc.*[71] Plaintiffs do not address *RAA Management*. The Court, upon its own review, finds that case legally and factually distinguishable.

Section 4.7 of the SPA contains a representation by *Defendants* stating that they have not made any extra-contractual representations or warranties "as to the accuracy or completeness of any information regarding [ACI] furnished to

---

[68] *Johnson & Johnson*, 352 A.3d at 273.

[69] *Id.*

[70] Mot. p. 26.

[71] *Id.* (citing *RAA Mgmt., LLC v. Savage Sports Hldgs, Inc.*, 45 A.3d 107, 112 (Del. 2012); *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 51 (Del. Ch. 2015)).

[Plaintiffs] . . . or as to the future revenue, profitability or success of [ACI]."[72] Notably, this is a representation Defendants made *about themselves*.

Under *Abry*, for an anti-reliance provision to be effective, the party claiming to have relied on a representation must have disclaimed its own reliance on such representations.[73] In *RAA Management*, the defendant made a similar representation to the one in the SPA, but the clause included an explicit acknowledgement from the plaintiff: "[The plaintiffs] *understand and acknowledge* that neither [the defendant] nor [its representative] is making any representation or warranty, express or implied, as to the accuracy or completeness" of the relevant materials.[74] Because Section 4.7 lacks any parallel acknowledgment or disclaimer by Plaintiffs, it constitutes an unfulfilled attempt by Defendants to unilaterally disclaim Plaintiffs' reliance.

A review of the surrounding contractual framework confirms that the omission of a plaintiff-side anti-reliance clause was a function of deliberate drafting. In Section 4.6 of the SPA, *Defendants* expressly represented that they entered into the transaction "*solely* upon [their] own investigation and the express representations and warranties of the Company and [Plaintiffs] set forth in this Agreement[.]"[75] The

---

[72] SPA § 4.7.

[73] *See Johnson & Johnson*, 352 A.3d at 273; *FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 860 (Del. Ch. 2016) ("[T]he disclaimer must come from the point of view of the aggrieved party (or all parties to the contract)[.]").

[74] *RAA Mgmt.*, 45 A.3d at 110.

[75] SPA § 4.6 (emphasis added).

15

parties were clearly capable of formulating enforceable anti-reliance provisions, but Defendants failed to secure a reciprocal representation from Plaintiffs.[76]

Section 5.6 is equally ineffective as an anti-reliance defense. In that Section, Plaintiffs acknowledge that they "investigated to [their] complete satisfaction all facts and potential claims" arising out of, among other things, any acts during the negotiation, execution, or performance of the SPA, and that they are "assuming the risk" that they "will discover . . . claims that were unknown or unanticipated at the time this Agreement was executed."[77] An assumption of the risk for unknown or unanticipated claims does not satisfy the demanding standard for anti-reliance language; it does not clear-sightedly waive claims predicated on a counterparty's active, pre-Closing fraudulent concealment.

The Rollover Agreement, however, commands a different result. In both the Kowatch and BRP2 Rollover Agreements, the respective Rollover Plaintiff expressly represents that it has relied "solely upon its own investigation and the express representations [of Defendants] set forth . . . and neither the Parent, the Buyer nor any other Person has made any representation or warranty, except as

---

[76] *See Paragon Metals Hldgs. LLC v. Smith*, --- A.3d ----, 2026 WL 1898766, at *8 (Del. July 1, 2026) (holding that only the "intended beneficiary" of an anti-reliance clause can enforce it); *see also Vaughn v. Allstate Prop. & Casualty Ins. Co.*, 351 A.3d 974 (TABLE), 2025 WL 3563289, at *3 n.12 (Del. Dec. 12, 2025) (quoting *Torrent Pharma., Inc. v. Priority Healthcare Distribution, Inc.*, 2022 WL 3272421, at *9 (Del. Super. Aug. 11, 2022) ("Where one contract section omits a term present in another, the omission is presumed intentional.")).

[77] SPA § 5.6(e).

16

expressly set forth herein."[78] This language explicitly satisfies the requirements of *Abry*. Accordingly, because the SPA lacks an effective anti-reliance provision, Plaintiffs' core fraud claims regarding the transaction survive.[79] The clear anti-reliance language in the ancillary Rollover Agreements may limit the scope of available non-cash damages at a later stage, but it does not warrant threshold dismissal of the fraud claim in its entirety. Defendant's Motion to Dismiss Count I is therefore DENIED.

### 3. Plaintiffs Adequately Allege Justifiable Reliance on the Investment Workbook

Because the SPA lacks an effective anti-reliance provision, the Court must evaluate whether Plaintiffs have adequately alleged that their reliance on the Investment Workbook was legally justified. To satisfy this element at the pleading stage, a complaint "must allege facts making it reasonably conceivable that the plaintiff acted based on the material representation or omission."[80] This inquiry is inherently "context-dependent" and fact intensive, rendering it generally unsuitable

---

[78] *See* Section 4(o) of the Rollover Agreements, available at D.I. 15 Exhibits C (Kowatch) and D (BRP2).

[79] *See Ashall Homes Ltd. v. ROK Ent. Gp. Inc.*, 992 A.2d 1239, 1250 n.56 (Del. Ch. 2010) ("related contemporaneous documents should be read together" and "writings executed at the same time and relating to the same transaction are construed together as a single contract[.]").

[80] *Trifecta Multimedia Hldgs. Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 465 (Del. Ch. 2024).

for resolution on a motion to dismiss "unless a fully integrated contract contains an explicit anti-reliance representation."[81]

Defendants argue that Plaintiffs' reliance was unreasonable as a matter of law because the Complaint fails to allege that Plaintiffs independently investigated the financial figures or were actively prevented from doing so.[82] Although Plaintiffs did not address this point in their briefing, Defendants' argument fails under the applicable standard of review. Determining what constitutes "reasonable" reliance requires a nuanced assessment situating the reliance along the spectrum between actual knowledge and mere negligence.[83] Such an evaluation merits the benefit of a developed evidentiary record.[84] It is not facially apparent from the four corners of the Complaint that Plaintiffs were willfully blind to inaccuracies in the Investment Workbook or that they otherwise failed to conduct adequate due diligence. Further, the generic acknowledgement in Section 5.6 that Plaintiffs investigated the transaction to their own satisfaction cannot be leveraged to insulate Defendants from liability for an alleged active fraud.[85]

---

[81] *Id.*

[82] Mot. p. 30.

[83] *Paragon Metal Hldgs. LLC*, 2026 WL 1898766, at *9.

[84] *Id.*

[85] *See id.* at *8 (concluding that diligence satisfying a party's subjective standard of completeness was insufficient to bar that party's reliance on the intra-contractual warranties in the governing agreement).

Because Defendants do not dispute that the final element of compensable damages is adequately pled,[86] Plaintiffs have stated a viable claim that the Investment Workbook fraudulently induced them into entering the transaction.

### 4. Plaintiffs Allege Negligent Misrepresentation in Connection with the Investment Workbook

Count II asserts a claim for negligent misrepresentation. Under Delaware law, negligent misrepresentation—frequently characterized as equitable fraud—is closely related to common law fraud and requires proof of the same underlying elements with the sole exception that a plaintiff need not demonstrate that the misstatement was made knowingly or recklessly.[87] Because negligent misrepresentation shares these identical elements with a reduced state of mind requirement, where a plaintiff has successfully alleged common law fraud, the parallel negligent misrepresentation claim likewise survives.[88]

Accordingly, Plaintiffs' negligent misrepresentation claim regarding the Investment Workbook may also proceed past the pleadings.

---

[86] Mot. p. 30 ("[D]efendants do not rely on that element in seeking dismissal at this stage.").

[87] *Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at \*12 (Del. Ch. Aug. 30, 2019); *see also Fortis Advs. LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at \*9 (Del. Ch. Jan. 30, 2015).

[88] *Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at \*8 (Del. Ch. Apr. 10, 2008).

## B. The Failure to Disclose VET TEC's Status Constitutes Fraud by Omission

Plaintiffs separately allege that Defendants' failure to disclose the imminent termination and defunding of VET TEC is actionable under theories of fraudulent concealment (Count I) or, in the alternative, negligent misrepresentation (Count II), as well as conspiracy to commit fraud (Count III).

### 1. Plaintiffs Allege a Fraudulent Omission

Unlike the alleged affirmative misrepresentations contained in the Investment Workbook, the allegations concerning the VET TEC program run on a theory of fraud by omission. Under Delaware law, a defendant is equally culpable of fraud where it fails to reveal material information that it has an obligation to disclose.[89] A duty to speak arises before the consummation of a business transaction when a party acquires information that is "necessary to prevent [a] partial or ambiguous statement of the facts from being misleading."[90] "One such duty to speak arises when the party learns of *subsequently acquired information* that the party knows will render a prior statement untrue or misleading."[91]

---

[89] *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

[90] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *13 (Del. Ch. Aug. 2, 2023) (citing Restatement (Second) of Torts § 551(2)(b) (1977)).

[91] *Wildenberg v. Sign-Zone Hldgs L.P.*, 350 A.3d 637 (TABLE), 2025 WL 2945823, at *2 (Del. Oct. 17, 2025) (citing *In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013)).

The Complaint satisfies this standard. Plaintiffs allege that the federal government notified Defendants in November 2023—prior to the Closing—that the VET TEC program had exhausted its funding and instructed ACI to immediately cease enrolling new participants.[92] Despite the fact that this program historically accounted for approximately 40% of ACI's total revenue, Defendants remained silent. Plaintiffs have adequately pled that Defendants had an affirmative duty to speak. Defendants had previously supplied historical financial data showing that VET TEC was an ongoing source of recurring revenue.[93] This historical data formed the baseline for a transaction structure that included two earnouts and a significant rollover equity component, neither of which accounted for the sudden elimination of nearly half of the Company's revenue stream.[94]

Defendants counter that the Complaint fails to identify any affirmative contractual representation guaranteeing that the VET TEC program would continue post-Closing, arguing that they had no duty to disclaim the general principle that past performance does not guarantee future results.[95] This argument is unpersuasive.

---

[92] Compl. ¶ 52. Plaintiffs also allege that Moua first learned the program would be discontinued in August 2023. *Id.*

[93] *See* Ans. Br. pp. 11–12.

[94] *Id.* at p. 12. That Defendants were allegedly aware of the VET TEC program's dissolution in August 2023 does not change their obligation to inform Plaintiffs of the November 2023 communication.

[95] Reply Br. p. 9. Defendants further argue that Plaintiffs should have known that VET TEC was winding down, because it "was public knowledge and easily accessible to anyone with a search

Having provided detailed historical revenue metrics to induce Plaintiffs to accept non-cash consideration, Defendants could not sit idly by once they received definitive confirmation that 40% of ACI's revenue stream was about to dry up. Defendants had a duty to disclose that the Company was about to lose its primary revenue driver.

### 2. *Plaintiffs Allege the Remaining Elements of Omission-Based Fraud*

With respect to the remaining elements of fraud, Defendants do not contest scienter at this stage, and the element of damages is sufficiently alleged. Defendants raise a final defense regarding justifiable reliance, asserting that Plaintiffs' failure to uncover the status of the VET TEC program during due diligence constitutes a failure to conduct adequate due diligence.[96]

Defendants rely on two decisions to argue that the Court should bypass the fact-specific nature of justifiable reliance and dismiss the omission claims at the threshold.[97] Both cases are readily distinguishable. In *Carey v. Shellburne, Inc.*, this Court entered judgment against the plaintiffs only after evaluating a complete evidentiary record at the conclusion of trial.[98] It offers no guidance on a motion to dismiss under Rule 12(b)(6). In *Harris v. Innovate Biopharmaceuticals, Inc.*, the

---

engine" that VET TEC was a pilot program with a fixed end date. *Id.* at p. 10. The Court does not reach this conclusion at the pleadings stage.

[96] Mot. p. 30.

[97] Reply Br. p. 10.

[98] 215 A.2d 450, 507 (Del. Ch. 1965).

Superior Court dismissed a claim where a stockholder argued that he was harmed by corporate counsel's delay in providing legal guidance regarding the marketing of his shares.[99] The Court found that the company owed no duty to provide independent legal advice to a stockholder.[100] Here by contrast, Defendants received critical operational notice regarding a regulatory program that was within their exclusive possession and control. The fraud claim arising from the VET TEC disclosure survives.

### 3. Plaintiffs Allege Negligent Misrepresentation in Connection with VET TEC

As discussed above, negligent misrepresentation requires proof of the same underlying elements as fraud except that the plaintiff need not demonstrate that the misrepresentation was made knowingly or recklessly.[101] Because the Complaint sets forth a viable claim for omission-based fraud regarding the VET TEC program, it satisfies the pleading requirements for the parallel negligent misrepresentation claim set forth in Count II.

In sum, because the SPA contains no clear or enforceable disclaimer of reliance by Plaintiffs, the core claims for pre-closing fraud and negligent misrepresentation are sufficiently pled under Rule 12(b)(6). Accordingly, Defendant's Motion to Dismiss is DENIED as to Count I and Count II.

---

[99] 2019 WL 5173782, at *8 (Del. Super. Oct. 15, 2019).

[100] *Id.*

[101] *See Dunn*, 2019 WL 4131010, at *12.

## C. Plaintiffs Adequately Allege Civil Conspiracy to Commit Fraud

To state a claim for civil conspiracy, "a plaintiff must allege '(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff.'"[102]

Defendants move to dismiss Count V on two grounds. First, they argue that the conspiracy claim must fail because Plaintiffs have failed to state a claim for an underlying independent tort.[103] Second, they assert that the claim is barred by the intra-corporate conspiracy doctrine.[104] The first argument is unavailing; as determined above, Plaintiffs have adequately alleged an underlying claim for fraud. The Court therefore turns to the applicability of the intra-corporate conspiracy doctrine.

Defendants argue that the alleged conspiracy runs afoul of the intra-corporate conspiracy doctrine because the individual and entity defendants operate in a singular commercial capacity as managers, affiliates, and controllers of ACI or as a wholly owned subsidiary, in the case of Infosec.[105] Defendants further contend that the Complaint fails to allege collective participation in the alleged fraudulent

---

[102] *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *14 (Del. Ch. Mar. 28, 2018) (quoting *Allied Cap. Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006)).

[103] Mot. p. 41.

[104] *Id.*

[105] *Id.* at p. 42.

inducement, pointing out that the factual allegations specifically target only Moua and certain unidentified ACI representatives.[106] Plaintiffs counter that Infosec, rather than ACI, serves as the critical independent entity for the conspiracy analysis.[107]

Despite the sparse briefing of this nuanced issue, the Court concludes that the allegations are sufficient to survive dismissal. The core of the dispute involves one individual—Moua—and two distinct entities: ACI and Boathouse. Under the intra-corporate conspiracy doctrine, a corporation generally cannot conspire with its own officers or agents when they are acting within the scope of their authority. Thus, Moua could not conspire with ACI while acting strictly in his capacity as Chairman of ACI's Board of Managers, nor could he conspire with Boathouse while acting purely as its managing partner.[108] The determinative question is whether Moua's dual roles could conceivably facilitate an actionable conspiracy between himself, ACI, and Boathouse.[109]

This Court has previously recognized that where a single individual concurrently wears two hats as an agent of two distinct entities, dismissal under the intra-corporate conspiracy doctrine is appropriate only if it is "beyond dispute" that

---

[106] Reply Br. pp. 15–16.

[107] Ans. Br. p. 20.

[108] *WIA Hldgs. LLC v. Scottish Am. Cap. LLC*, 2026 WL 1204494, at *16–17 (Del. Ch. Jan. 20, 2026).

[109] *See LVI Gp. Invs., LLC*, 2018 WL 1559936, at *15.

the individual was operating exclusively as the agent of a single entity.[110] Where the factual allegations suggest that the individual and the separate entity affiliates shared an obvious distinct economic incentive to participate in the underlying fraud, it remains reasonably conceivable at the pleading stage that the parties acted pursuant to an unlawful agreement or common design.[111] Applying these principles and drawing all reasonable inferences in Plaintiffs' favor, it is premature to conclude as a matter of law that the Defendants operated as a single economic actor incapable of conspiring. Accordingly, the Motion to Dismiss Count V as to conspiracy to commit fraud is DENIED.[112]

### D. Breach of Fiduciary Duty is Inadequately Pled

Separate from the pre-Closing fraud claims, Plaintiffs allege that Boathouse and Moua breached their fiduciary duties to the Rollover Plaintiffs by diluting the Rollover Equity through a series of post-Closing self-dealing transactions (Count III).[113] Plaintiffs further contend that ACI and Infosec actively aided and abetted those breaches (Count IV).[114]

---

[110] *Id.*

[111] *Id.*

[112] The Court again highlights the inadequate briefing of this issue. Defendants outline the black letter law of the intra-corporate conspiracy doctrine, but they do not address how it bars a conspiracy here. Mot. pp. 40–42; Reply Br. pp. 15–16.

[113] Compl. ¶¶ 80–86.

[114] *Id.* at ¶¶ 87–92.

### 1. *The Direct Claim Fails*

The threshold inquiry is whether the alleged equity dilution states a direct claim, a derivative claim, or both. Plaintiffs contend that they are pursuing a direct claim because the Rollover Plaintiffs were "directly and uniquely injured . . . in their capacity as minority members of ACI.[115] Defendants counter that the allegations do not support an individualized or targeted injury.[116] They argue that the newly issued senior units would proportionally reduce the economic and voting ownership of any similarly situated holder of common equity, rendering the claims exclusively derivative.[117]

Although direct or derivative standing issues are frequently assessed under the umbrella of subject matter jurisdiction, this Court may dismiss a purported direct claim under Court of Chancery Rule 12(b)(6) if the core allegations are "exclusively derivative in nature[.]"[118] To determine whether a claim is direct or derivative, Delaware courts apply the analytical framework established in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, which focuses on two pivotal questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2)

---

[115] *Id.* at ¶ 86.

[116] Reply Br. p. 11.

[117] *Id.*

[118] *Re: the Gregory M. Raiff 2000 Tr. v. Jenzabar, Inc.*, 2026 WL 1861372, at *2 (Del. Ch. June 26, 2026) (denying re-argument of *Gregory M. Raiff 2000 Tr. v. Jenzabar, Inc.*, 2026 WL 992587 (Del. Ch. Apr. 13, 2026)).

who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[119] In resolving this divide, the Court ignores the stylistic labels appended by the drafter and looks instead to the independent nature of the wrong alleged.[120]

While not addressed by the parties, *Siegel v. Cantor Fitzgerald, L.P.* is on all fours with the present dispute. In *Siegel*, a minority stockholder brought a direct claim against a majority stockholder following an internal corporate restructuring that effectively diluted the minority's voting and economic interest.[121] The plaintiff there argued that the company had overissued senior high-vote shares to the majority stockholder for manifestly inadequate consideration.[122] In applying *Tooley*'s first prong, this Court reiterated that a corporation's over-issuance of undervalued equity to a controlling stockholder inflicts an immediate, "threshold harm" upon the corporate entity itself because the company received inadequate consideration. Any subsequent harm to the minority stockholders represents a secondary reflective injury that merely flows to them indirectly in proportion to their relative equity ownership.[123] Turning to the second prong of *Tooley*, the *Siegal* Court invoked

---

[119] *Gregory M. Raiff 2000 Tr. v. Jenzabar, Inc.*, 2026 WL 992587, at \*5 (citing *Tooley*, 845 A.2d 1031, 1033 (Del. 2004)).

[120] *Id.*

[121] *Siegel v. Cantor Fitzgerald, L.P.*, 2025 WL 1074604, at \*1 (Del. Ch. Apr. 10, 2025).

[122] *Id.*

[123] *Id.*

28

*Brookfield Asset Management Inc. v. Rosson* to reject the theory that a specialized *pro rata* recovery could convert the action into a direct claim, noting that only the corporation possesses the right to compel the restoration of value for a dilutive overissuance.[124]

The rational articulated in *Siegel* and *Brookfield* controls here. Plaintiffs allege that Defendants—who already maintained majority control over ACI—utilized the post-Closing Transaction and the subsequent preferred stock issuances to expand their percentage control via undervalued shares, systematically diluting the common equity held by the Rollover Plaintiffs. As in *Siegel*, the primary economic harm was suffered by ACI, which allegedly issued senior securities to insiders on overly favorable terms without receiving matching, fair market value. Any resulting recovery would necessarily require restoring that missing economic value directly to ACI.[125] Because the alleged injury is reflecting and asset-dilutive rather than unique or independent, the Rollover Plaintiffs have failed to state a viable direct claim for breach of fiduciary duty.

### 2. *The Derivative Claim Fails for Failure to Allege Demand Futility*

Because the equity dilution allegations state an exclusively derivative claim, the Court must next evaluate whether Plaintiffs complied with the strict procedural

---

[124] *Id.* at *7.

[125] At oral argument, Plaintiffs correctly abandoned their contention that the harm was individualized. Tr. 49:9.

demand requirement set forth in Court of Chancery Rule 23.1.[126] Under Rule 23.1, a derivative complaint must state with particularity any effort by the plaintiff to obtain the desired action from the entity's governing body or specific reasons why such an action was not made.[127] A stockholder can bypass this internal prerequisite only by pleading with specific factual particularity that demand is futile.[128]

The universal, governing test for establishing demand futility is set forth in *United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg*.[129] Under the three-pronged *Zuckerberg* framework, courts must evaluate demand futility on a director-by-director basis, testing whether each individual director on the board at the time the litigation commenced: (i) received a material personal benefit from the misconduct, (ii) faces a substantial likelihood of liability on any of the claims, or (iii) lacks independence from someone who received a material personal benefit or faces a

---

[126] *Los Angeles City Emp. Ret. Sys. v. Sanford*, 352 A.3d 276, 321 (Del. Ch. 2026).

[127] *Id.*; *see also* Ct. Ch. R. 23.1(a)(1).

[128] In a demand futility analysis:

> [t]he court is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice. Rule 23.1 requires that a plaintiff who asserts demand futility must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). The court will draw all reasonable factual inferences that logically flow from the particularized facts alleged.

> *Cent. Laborers' Pension Fund v. Karp*, 349 A.3d 1165, 1182 (Del. Ch. 2025) (internal quotations omitted).

[129] 262 A.3d 1034, 1058 (Del. 2021).

substantial likelihood of liability.[130] If the answer to any of these questions is affirmative for at least half of the members of the board at the time of litigation—the demand board—then demand is futile.[131]

The Complaint alleges that demand upon ACI's Board of Managers would be futile because, at the time the lawsuit was filed, Moua served as the Chairman of ACI's Board, Boathouse CCF acted as ACI's Managing Member, and Moua operated as the Managing Partner of Boathouse CCF.[132] Plaintiffs contend that because these identical individual and entity defendants are the primary wrongdoers who executed the self-dealing recapitalization, they are incapable of independently evaluating a demand to sue themselves.[133] In their Answering Brief, Plaintiffs expand this theory, asserting that because Moua allegedly admitted that ACI engaged in active financial misrepresentations during pre-Closing diligence, both he and the Boathouse entities face a substantial likelihood of personal liability.[134]

---

[130] *Zuckerberg*, 262 A.3d at 1059.

[131] *Id.*

[132] Compl. ¶ 81.

[133] *Id.* at ¶ 86; *see also* Ans. Br. p. 16.

[134] Ans. Br. p. 16; Compl. ¶ 58.

Defendants reply that this reasoning is "completely unclear" and conclusory,[135] asserting that the Complaint fails to satisfy the stringent requirements of Rule 23.1.[136]

The Rollover Plaintiffs' demand futility argument fails for a fundamental mathematical reason. The Complaint fails to provide any specific particularized factual disclosures regarding the structural composition of the ACI Board of Managers. Plaintiffs allegations target only Moua. To establish that a disqualifying conflict disables at least half of the demand board under *Zuckerberg*, Plaintiffs would need to allege specific facts showing that the entire Board of Managers consists of no more than two members. In the absence of any particularized allegations identifying the remaining managers or demonstrating that Moua exerts total domination over a deadlocked board, the Court cannot infer that a conflict isolating Moua disables a majority of ACI's governing body.[137] Accordingly, because Plaintiffs have failed to supply the factual particularity required to demonstrate demand futility under Rule 23.1, they lack standing to pursue a derivative claim. Count III is therefore DISMISSED. Because a well-pleaded claim

---

[135] Reply Br. p. 12.

[136] Tr. 27:8.

[137] *See In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989–90 (Del. Ch. 2007) ("Plaintiffs must show that a majority—or in a case where are an even number of directors, exactly half—of the board was incapable of considering the demand.").

for breach of fiduciary duty is a prerequisite to an action for aiding and abetting,[138] Count IV must likewise be DISMISSED.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is DENIED as to the fraud and negligent misrepresentation claims in Counts I and II as to inducement into the SPA and GRANTED as to inducement into the Rollover Agreements. Defendants' Motion to Dismiss is GRANTED as to the breach of fiduciary duty and aiding and abetting claims in Counts III and IV. Finally, as to conspiracy to commit fraud in Count V, Defendants' Motion is DENIED to the extent the conspiracy is predicated on the pre-closing fraud claims and GRANTED to the extent it is predicated on the dismissal of the fiduciary duty claims.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge

---

[138] *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995) (noting that a breach of fiduciary duty is a required element of a claim for aiding and abetting).

33